*Felicia Robinson, et al. v. Canton Harbor Healthcare Center, Inc.*, No. 2169, September Term, 2022, filed April, 24, 2024.  Opinion by Beachley, J.

**HEALTH CLAIMS ARBITRATION ACT – CERTIFICATE OF QUALIFYING EXPERT – CAUSATION – PRESSURE ULCERS**


**Facts**:  In the Circuit Court for Baltimore City, the wife and children of decedent, Everett Robinson, filed a medical malpractice claim against Canton Harbor Healthcare Center, a skilled nursing facility.  With their complaint, the Robinsons provided a certificate of qualifying expert ("CQE").  The CQE was authored by a registered nurse, who opined both that Canton Harbor breached the standard of care for skilled nursing facilities and that this breach caused Mr. Robinson to develop pressure ulcers.  Canton Harbor moved to dismiss the complaint, arguing that a registered nurse is not qualified to provide an opinion on medical causation.  The circuit court agreed and dismissed the complaint.  The Robinsons then appealed.

**Held:**  Reversed.

After reviewing the statutory and regulatory framework, the Appellate Court held that, in a case against a skilled nursing facility alleging pressure ulcer injury, a nurse with sufficient training and experience can attest to the cause of a patient's pressure ulcer injury in a CQE.  CJP § 3-2A-02 provides that a "health care provider" may serve as the expert in a CQE.  Registered nurses are included in the statutory definition of "health care provider."  Various Maryland and federal statutes and regulations relating to RNs and skilled nursing facilities indicate that the prevention and treatment of pressure ulcers are tasks entrusted primarily to nursing staff.  Furthermore, COMAR 10.27.09.02 provides that the functions of registered nurses include nursing diagnosis, developing a plan of care that prescribes interventions to achieve expected outcomes, and revising the plan of care based on the effectiveness of the interventions.  Together, these statutes and regulations indicate that a sufficiently experienced and trained RN may qualify as an expert on the cause of pressure ulcers.

Circuit Court for Baltimore City
Case No.: 24-C-22-001200

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2169

September Term, 2022

_____

FELICIA ROBINSON, ET AL.

v.

CANTON HARBOR HEALTHCARE
CENTER, INC.

_____

Arthur,
Beachley,
Eyler, Deborah S.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Beachley, J.

_____

Filed: April 24, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In this appeal from the dismissal of a complaint against a skilled nursing facility under Maryland's Health Care Malpractice Claims Act (the "HCMCA"), alleging negligent failure to prevent and treat decubitus ulcers, we resolve a question of first impression by holding that the statutorily required certificate of qualified expert ("CQE") may be predicated on a proximate cause attestation from a registered nurse ("RN"), rather than a physician. *See* Md. Code (1974, 2020 Repl. Vol.), § 3-2A-04 of the Courts & Judicial Proceedings Article ("CJP").

As personal representative of her late husband Everett Robinson's estate, and in her capacity as his survivor, Felicia Robinson, appellant, sued Canton Harbor Healthcare Center, Inc., appellee ("Canton Harbor"), where Mr. Robinson was an inpatient for approximately five months following his hospitalization for a stroke.[1] Mrs. Robinson alleged that this skilled nursing facility was negligent in its care of her husband, causing him to suffer injuries from decubitus (or pressure) ulcers.

The Circuit Court for Baltimore City dismissed her complaint, ruling that a registered nurse is not qualified to attest to proximate causation for the purpose of satisfying Maryland's statutory requirement that "[a] person having a claim against a health

---

[1] Mr. Robinson's surviving children, Sharetta Moyd, Jason Blake, and Everett B. Robinson, III, also sued and appeal from the judgment dismissing their claims. We note, however, that Mrs. Robinson and the surviving children later abandoned their claim for wrongful death. *See generally Spangler v. McQuitty*, 449 Md. 33, 53 (2016) ("The wrongful death statute allows the decedent's beneficiaries or relatives to recover damages for loss of support or other benefits that would have been provided, had the decedent not died as a result of another's negligence."); CJP § 3-904(a)(1)-(b). Thus, this appeal involves only the circuit court's dismissal of the survival claim alleged by Mrs. Robinson in Count One of the complaint.

care provider for damage due to a medical injury" must timely file a CQE "attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury[.]" *See* CJP § 3-2A-04(a)(1)(i), (b)(1)(i). The court also denied Mrs. Robinson's request for leave to amend her CQE and complaint, effectively foreclosing any further relief given the expiration of limitations.

Interpreting Maryland's statutory language in light of its purpose and related regulations, we conclude that in a medical negligence case alleging ulcer injury, a CQE may be predicated on a proximate causation attestation by a registered nurse with sufficient education and experience in skilled nursing standards for preventing and treating pressure ulcers.[2] Because Mrs. Robinson's CQE is sufficient based on the certifying registered nurse's expertise, the Circuit Court for Baltimore City erred in dismissing this action. Consequently, we will vacate the judgment and remand for further proceedings.

## BACKGROUND

*The Complaint and Certificate of Qualified Expert*

On March 7, 2022, Felicia Robinson, as personal representative of the Estate of Everett Robinson and as his surviving widow, filed a complaint against Canton Harbor. She alleged that Mr. Robinson was admitted to this long-term care facility "after being transferred from Johns Hopkins Hospital for follow up care due to a stroke." "During his admission, the deceased developed left leg ulcers which were brought to the attention of

---

[2] As we explain, our holding is narrow. Although we conclude that the registered nurse in this case may certify that a breach in the standard of care caused ulcer injury to Mr. Robinson, we express no opinion concerning a nurse's qualifications to attest to the causation of other injuries, including death.

the facility in which [he] should have been properly treated and care[d] for." Yet "[t]he bedsores were allowed to develop and spread to the buttocks area as well as the inner thigh." "As a direct and proximate result of the Defendant's neglect," Mrs. Robinson contended, "the areas became infected and deceased was transferred and received further treatment and care for his condition at other facilities[;] however, this condition worsened and he became septic and died." Canton Harbor allegedly "breached the standard of care by failing to proper[ly] turn the deceased, failure to do proper skin checks, failure to respond to complaint[s] about the pressure ulcers and was otherwise negligent."

In Count One, Mrs. Robinson alleged that "[a]s a direct and proximate result, the deceased suffered pain, incurred medical bills and the Estate incurred funeral expenses." In Count Two, she and Mr. Robinson's three surviving children alleged that "[a]s a result of the negligence" by Canton Harbor, they "suffered and continue to suffer enormous grief, sadness, and emotional pain and suffering as a direct and proximate result of the wrongful death and were otherwise injured and damaged." Mrs. Robinson and her children later abandoned their wrongful death claim.

Canton Harbor was served with the complaint and corresponding documents, including a CQE in which a registered nurse, Anjanette Jones-Singh, attested:

1. I am a registered nurse and am familiar with and knowledgeable of the standards of care applicable to the treatment and care of an individual under the circumstances of the treatment and care as provided to Everette [sic] Robinson in this matter.

   . . .

3. I have reviewed the pertinent medical records pertaining to the deceased's treatment and care.

3

4. In my opinion to a reasonable degree of medical certainty [Canton Harbor] breached the standard of care and the breach was the proximate cause of Mr. Robinson's injuries, i[.]e., the development of his pressure ulcers.

5. I hereby incorporate my report herein dated September 7, 2021.

Consequently, we next examine the contents of Jones-Singh's detailed report.

*Jones-Singh's Affidavit and Report*

Jones-Singh prepared a 19-page report and affidavit, reviewing Mr. Robinson's care at Canton Harbor, where "he was completely dependent for care" and unable to either communicate effectively or move independently. Jones-Singh had been a registered nurse for over sixteen years, during which she had "routinely perform[ed] skin evaluations on [her] patients, identified pressure ulcers, classified the staging[3] of each ulcer and proposed a treatment and care plan to heal the ulcer" for more than "500 patients." She had "worked as a wound care nurse . . . at Arcola Nursing and Rehabilitation Center," from 2006-2008, during which she "routinely diagnosed the cause of pressure ulcers." In her current position as "a long-term care Director of Nursing and Resident Assessment Coordinator[,]" she has "received annual updates in the field of wound care and pressure ulcers." She stated that she is "abundantly qualified by background, education and experience to address the issues as to whether Mr. Robinson's treatment was within the standard of care and whether the failure to comply with the standard caused him injury, which it did, in the form of a pressure ulcer."

---

[3] A pressure ulcer is categorized into one of four stages based on its severity. Stage 1 is least severe, and stage 4 is most severe. Syed Rafay H. Zaidi & Sandeep Sharma, *Pressure Ulcer*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK553107/ (last updated Jan. 3, 2024).

4

Jones-Singh reviewed Canton Harbor's records related to Mr. Robinson, which included those relevant to the "development of wounds in this case," *i.e.*, the "[a]dmission assessment" and "[s]ubsequent skin" and "[n]utritional assessments," "[c]are [p]lans" and "progress notes" by physicians and nurse practitioners, "[w]ound [e]valuations," and the "MDS."[4]    In addition, she reviewed Mr. Robinson's medical history showing his "admitting diagnoses" and medications.

Mr. Robinson was admitted on August 16, 2018, and discharged on January 5, 2019. According to Jones-Singh, given Mr. Robinson's physical and cognitive limitations throughout his admission, he "was only oriented to himself" and "relied heavily on staff to turn and reposition him, assist him with ADL care,[5] provide him with nutrition, and anticipate his needs."

At his "initial admission assessment, conducted by Tracey Tralany, RN on August 16, 2018[,] . . . Mr. Robinson did not have a pressure ulcer on admission."  According to Jones-Singh, although he presented "with a surgical incision to the left side of his head[,]" it was "[d]uring his stay at Future Care" that "Mr. Robinson developed pressure ulcers to

---

[4] The term "MDS" is an abbreviation for "Minimum Data Set," which is a "tool for implementing standardized assessment and for facilitating care management in nursing homes." *See Minimum Data Set (MDS) 3.0 for Nursing Homes and Swing Bed Providers*, Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/quality/nursing-home-improvement/minimum-data-sets-swing-bed-providers (last updated Jan. 12, 2024).

[5] "ADL" means "activities of daily living," and includes eating, bathing, getting dressed, and using the bathroom.  Peter F. Edemekong et al., *Activities of Daily Living*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK470404/ (last updated June 26, 2023).

his right buttock and left buttock, which were then merged into a sacral ulcer."

Jones-Singh recounted Mr. Robinson's deteriorating skin condition following his admission to Canton Harbor. Given his "initial Braden scale, which is a tool used to determine the risk that a person has to develop pressure ulcer[s]," Mr. Robinson "was at high risk for developing pressure ulcers, with a score of 11." Initial orders called for the facility to implement orders to "Float heels[,]" "Turn and Reposition[,]" and use "Barrier Cream[,]" a "Pressure reducing Mattress[,]" and a "Pressure reducing cushion[.]"

According to facility records, on August 20, just four days after admission, Mr. Robinson had "developed a right buttock ulcer" and "a left buttock ulcer." Moreover, the same day, Mr. Robinson was noted to have "skin impairment to his sacral area." According to Jones-Singh,

> [i]nitially, this area was classified as Incontinence Associated Dermatitis (IAD). The standard of practice states that any wound noted on a pressure ulcer site must be classified as such. Therefore, IAD cannot be the etiology of a sacral ulcer. The same sacral ulcer was initially observed as a stage 2 ulcer and had declined to a stage 3 ulcer, where it needed a topical debriding agent in which Santyl was ordered.
>
> Mr. Everett Robinson was noted with a Suspected Deep Tissue Injury surrounding his sacral ulcer in a weekly skin note[] dated September 28, 2018. A suspected deep tissue injury is damage[] to underlying skin only caused by friction and/or shearing. Therefore, Future Care Canton Harbor directly caused the SDTI to the sacrum noted on Mr. Robinson as there is no other etiology for this type of wound.

Jones-Singh noted that Mr. Robinson "was not started on Eliquis until September 11, 2018," even though such anti-coagulant "intervention . . . should have [been] put in place" from the outset "to assist with tissue perfusion[,]" given the patient's high risk of developing pressure ulcers. In turn, "this delay led to a decrease in Mr. Robinson's tissue

6

perfusion" that contributed to his development of pressure ulcers. By the time he began receiving Eliquis, Mr. Robinson's "very high risk" had materialized, because he "had already developed multiple ulcers and was undergoing treatment to resolve them."

In addition, Jones-Singh concluded that "the facility failed to meet [his] nutritional requirements thereby contributing to his skin breakdown." She noted that Mr. Robinson's nutritional assessment on September 13 indicated that he had been losing weight since admission and that his protein level was low. Despite these indicators and that Mr. Robinson was being treated for pressure ulcers, he "never had any supplements ordered for wound healing such as Vitamin C, Zinc Sulfate, or Prosource."

On October 8, Canton Harbor's records show that he "also developed excoriation to his perineal area[.]" Jones-Singh explained that skin condition "more than likely . . . develops with prolonged exposure to both urine/fecal matter" and "would have been prevented if Barrier Cream was being used with each incontinent change."

Although the same Primary Care Physician examined Mr. Robinson eight times between August 21 and December 26, 2018, not one of that doctor's assessments mentioned Mr. Robinson's wounds. Nor was any medication provided to prevent pain. According to Jones-Singh,

> [t]he standard of practice would require that a patient/resident who has multiple wounds or stage 3-4 wounds receive pain medication 30 minutes to an hour prior to dressing changes. Mr. Robinson's wounds had declined to a stage 3, meeting the aforementioned criteria. Because the attending Physician never addressed Mr. Robinson's wounds and failed to provide pain medication prior to dressing changes, *it is in my professional opinion that Mr. Robinson suffered unnecessary pain during his dressing changes, which could have been prevented with the proper interventions prior to the treatment.*

7

(Emphasis added).

Jones-Singh offered the following opinions based on her comprehensive review of Mr. Robinson's records:

> [I]t is my ***opinion to a reasonable degree of nursing certainty, that Future Care of Canton Harbor breached the standard of care for skilled nursing facilities/post-acute rehabilitation. Their failure increased the risk of harm, in fact harm did occur.***
>
> The facts and clinical analysis in this report represent a deviation from the acceptable standard of nursing care. This includes ***violations of federal and state regulations***, which are part of the acceptable standard of care and also their own policies and procedures, which are part of the acceptable standard of care.
>
> ***[Canton Harbor's] statutory breaches include, but are not limited to causing the following injuries: left buttock, right buttock, sacral ulcer, and a suspected deep tissue injury.***
>
> ***Future Care Canton Harbor breached the standard of care by:***
>
> - Failure to prevent, monitor, document, manage and treat skin injury[;]
>
> - Failure to provide personal hygiene ***such that actual harm occurred***[;]
>
> - Failure to train and monitor staff compliance related to: Routine skin and pain assessments, ITD communication and coordination of care, and care of blistering (lower leg extremity) skin[;]
>
> - Failure to provide adequate nutrition[;]
>
> - Failure to address abnormal labs[; and]
>
> - Failure to accurately complete MDS assessments driving the care planning process:
>
>   o Failing to write and maintain up to date care plan interventions that support skin breakdown prevention, healing[.]

8

(Emphasis added).

In support of her conclusions, Jones-Singh cited and quoted specific federal regulations establishing relevant care standards for a skilled nursing facility offering long-term care for incontinent and bed-bound patients like Mr. Robinson, then described how Canton Harbor's care failed to meet those standards.

First, Jones-Singh concluded that the facility failed to "develop a comprehensive care plan . . . that includes measurable objectives and timetables to meet a resident's medical, nursing and mental and psychosocial needs, as identified in the comprehensive assessment." She specifically opined that the following care plans "did not meet the standard of care for Mr. Robinson in order to safely and compassionately" care for him:

- "Potential for Impaired Skin integrity": "the facility failed to implement a comprehensive nursing care plan that could assist and aid[] in the prevention o[f] pressure ulcer formation," so that "the nursing department did not have a guide to assist them in these preventative measures."

- "Pain related to multiple wounds": Canton Harbor "[d]id not reflect other reasons for pain," meet goals to interrupt pain, or "[p]rovide pain medication 30 mins to an hour prior to dressing change[.]"

- Failure to develop care plans required to meet the standards of care for nutritional deficit, weight loss, and pain related to wounds.

Second, Jones-Singh identified violations of specific federal standards requiring treatment to prevent and heal pressure ulcers.

> Based on the comprehensive assessment of a resident, the facility must ensure that (1) A resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and (2) A resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing.

9

*See* 42 C.F.R. § 483.25(b)(1).

Likewise, Jones-Singh specified the applicable standards for treatment of a pressure ulcer:

> For a resident who . . . has a pressure ulcer that is not healing, or is at risk of developing subsequent pressure ulcers, the facility is in compliance with this requirement if they:
>
> - Accurately or consistently assess a resident's skin integrity on admission and as indicated thereafter
>
> - Recognized and assessed factors placing the resident at risk of developing a new pressure ulcer or experiencing non-healing or delayed healing of a current pressure ulcer, including specific conditions, causes and/or problems, needs and behaviors
>
> - Defined and implemented interventions for pressure ulcer prevention and treatment in accordance with resident needs, goals, and recognized standards of practice
>
> - Address the potential for infection management
>
> - Revised approaches.

"Despite Mr. Robinson's underlying comorbidities, Future Care Canton Harbor had the duty to provide prevention-oriented interventions to reduce the incidence of skin breakdown." Over the course of his admission until discharge on January 5, 2019, "several breaches occurred causally related to Mr. Robinson's decline in health such that harm occurred[,] including" failures to complete "Braden Scales correctly to proactively adapt the careplanning process based on accurate assessment findings[,]" particularly during the critical "first four weeks after admission to a long-term care facility[,]" and failure to "[c]onduct a comprehensive and routine pain assessment." Jones-Singh explained that

[t]he standard of care and duty of Future Care Canton Harbor called for the following:

√ Routine (daily) skin inspections, reporting to the charge nurse an[y] changes to the skin during showers and/or peri-care

√ Routine skin (risk) assessments (i.e., Braden Scale)

    o Care plan interventions and physician orders identified from risk assessment findings

√ Removal of devices to routinely assess the skin (i.e., heel-booties)

√ Utilizing a Group II bed (alternating air loss) before heel breakdown occurred

√ Interventions to address complications related to immobility (i.e., repositioning, off-loading, foot cradles and air loss mattress function)

√ Shear and friction considerations (i.e., head of bed elevation $\leq$ to 30 degrees, OT seating and positioning modifications, off-loading)

√ Incontinence care (i.e., skin cleansers, barrier creams, briefs)

√ Family education

    o Skin safety interventions related to non-adherence

√ Following physician's orders.

In Jones-Singh's opinion as a registered nurse with training and experience in preventing and caring for pressure ulcers in incontinent patients at federally regulated skilled nursing facilities,

[t]he facts and clinical analysis in [her] report represent a deviation from the acceptable nursing standard of care. This includes violations of federal and state regulations, which are part of the acceptable standard of care and also their own policies and procedures, which are part of the acceptable standard of care.

Given "what happened to Mr. Robinson," she concluded that "there was a lack of oversight; utilization of nursing process; care planning; critical thinking and lack of urgency resulting

11

in substandard care."  In turn, "[t]hese actions resulted in avoidable pressure ulcers to Mr. Robinson's left buttock, right buttock, and sacral area."

*Motion to Dismiss*

In response to Mrs. Robinson's complaint and CQE, Canton Harbor filed a "Preliminary Motion to Dismiss."  Citing CJP § 3-2A-04(b)(1)(i), the statutory requirement for a CQE attesting to breach of the standard of care that proximately caused the alleged injury, and Md. Rule 5-702 requiring an expert witness to be "qualified as an expert by knowledge, skill, experience, training, or education," Canton Harbor argued that Jones-Singh's CQE did not comply because "a registered nurse cannot provide expert testimony [on] the issue of proximate causation."

Although Canton Harbor acknowledged that "there are no reported Maryland decisions that directly address this issue," it maintained that "the language of the applicable statutes and regulations makes clear that registered nurses are not qualified to provide such testimony."  In support, Canton Harbor relied on the difference between nursing and medical diagnoses.  Under Maryland law, "practice registered nursing" is statutorily defined to

> mean[] *the performance of acts requiring substantial specialized knowledge, judgment, and skill* based on the biological, physiological, behavioral, or sociological sciences *as the basis for assessment, nursing diagnosis*, planning, implementation, and evaluation of the practice of nursing *in order to*:
>
> (i) *Maintain health*;
>
> (ii) Prevent illness; or
>
> (iii) *Care for or rehabilitate the ill, injured, or infirm*.

12

Md. Code, (1981, 2021 Repl. Vol.), § 8-101(o)(1) of the Health Occupations Article ("HO") (emphasis added). In turn, "Nursing diagnosis" is defined by Maryland regulation as "a description of the actual or potential, overt or covert **health problems which registered nurses are licensed to treat**." COMAR 10.27.09.01(b)(16) (emphasis added).

In contrast, Canton Harbor emphasized, the statutory definition of the "[p]ractice of medicine" means to "engage . . . in **medical**: (i) **Diagnosis**; (ii) Healing; (iii) Treatment; or (iv) Surgery." HO § 14-101(o)(1) (emphasis added). Practicing medicine expressly encompasses "[d]iagnosing, healing, treating, preventing, prescribing for, or removing any physical . . . ailment." HO § 14-101(o)(2). Acknowledging that there is no definition for "*medical diagnosis*" in the statutory scheme, Canton Harbor cited dictionary definitions of "diagnosis" as a "determination of a medical condition (such as a disease) by physical examination or by study of its symptoms," *Diagnosis*, Black's Law Dictionary (11th ed. 2019), and "the art or act of identifying a disease from its signs and symptoms" and "investigation or analysis of the cause or nature of a condition, situation or problem," *Diagnosis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/diagnosis (last updated March 18, 2024).

According to Canton Harbor, because

the term "medical diagnosis" is used in its definition of "practice medicine" and "nursing diagnosis" is used in its definition of "practice registered nursing," the Maryland legislature made clear that registered nurses are not permitted to make a medical diagnosis; they are only permitted to make a nursing diagnosis which is limited to providing a description of a health problem. With that in mind, a nurse cannot provide medical causation testimony because, by its very nature, such testimony requires the nurse to opine as to whether the tortfeasor's breach of the standards of care caused

13

the plaintiff's injuries and/or damages. It requires <u>more</u> than providing a mere "description" of the plaintiff's health problem.

In support of its narrow reading of the statute, Canton Harbor cited "[a]ppellate decisions from other jurisdictions" that it maintained "held similar views[,]" arguing that its narrow view of the proximate causation requirement for a CQE is "consistent with the public policy considerations" underlying the Act to "weed[] out non-meritorious claims." In Canton Harbor's view, "[a]llowing a nurse to offer expert opinions outside the scope of her profession[] would be the quintessential scenario the Act was intended to prevent." In turn, because Mrs. Robinson's CQE lacks proper attestation that "breach[ing] the standard of care proximately caused the injuries at issue as statutorily required[,]" the circuit court was "*required* to dismiss" the complaint under CJP § 3-2A-04(b)(1)(i) ("[A] claim or action . . . shall be dismissed" for failure to comply with CQE requirement.), and *Breslin v. Powell*, 421 Md. 266, 299 (2011) ("[A]ny deficiency in the Certificate *requires* the arbitration panel or court to dismiss the claim or action without prejudice." (emphasis added)).

In her opposition, Mrs. Robinson argued that, under *Debbas v. Nelson*, 389 Md. 364 (2005), when, as in this case, the CQE text satisfies the breach and causation elements on its face, the defendant health care provider is "not allowed to collaterally impeach" it. Given "her knowledge, training, experience and education," Jones-Singh "qualif[ied] as an expert pursuant to Rule 5-702" who could "determine the cause of [Mr. Robinson's] altered skin condition and . . . opine that due to various breaches in care that these breaches caused pressure ulcers."

14

Because the complaint alleges claims against a skilled nursing facility, Mrs. Robinson contended that Jones-Singh is "providing peer to peer review, which is within the statutory scheme of the" Act and consistent with federal laws governing nursing home care. Specifically, under the Federal Nursing Home Reform Act, enacted in 1965, standards of care are enumerated in 42 C.F.R. § 483.25, as detailed in Jones-Singh's report. Pointing out that no Maryland "case has established a bright line rule holding that causation opinions can only be established by physicians[,]" Mrs. Robinson asserted that "the majority of states which have considered the specific issue raised by the defense have held that a nurse can render causation opinions as to decubitus ulcers." Moreover, "[i]f the legislators wanted a bright line rule on the issue of causation, then the statutory scheme would have stated that . . . the CQE must be signed by a physician."

In reply, Canton Harbor argued that "*Debbas* does not support Plaintiffs' position" that this CQE cannot be collaterally impeached, because that decision involved an improper attempt to impeach a CQE that was valid at the time it was filed, with evidence that the expert subsequently testified inconsistently with the opinion expressed in that CQE. *See Debbas*, 389 Md. at 380-84. Here, in contrast, Canton Harbor properly challenged the validity of Mrs. Robinson's CQE on the ground that it was invalid when filed "because a registered nurse cannot provide a medical diagnosis in Maryland and therefore cannot opine as to medical causation."

Moreover, Canton Harbor disputed that the CQE merely attested to a breach in the standard of care causing "the development of pressure wounds," because "to be valid" for purposes of supporting a wrongful death claim, the CQE had to "make that causal

15

connection" between the breach in the standard of care and Mr. Robinson's death. Any such opinion attesting to cause of death "would require an assessment of the Decedent's litany of pre-existing, underlying, comorbidities and the role those comorbidities played in the dying process, along with the impact the Decedent's pressure wounds had on those underlying comorbidities." Canton Harbor continued, "[s]uch an assessment certainly falls well outside of the scope of a registered nurse's professional licensure and expertise[,]" making it "inconsistent with the purpose of the" HCMCA.

At a motion hearing on January 25, 2023, counsel for both parties reasserted that "there is no reported Maryland decision on this exact issue" and there is "no one case dealing with this issue." Canton Harbor, again citing to "decisions from other jurisdictions" holding that "a nurse is not qualified to opine on the issue of proximate causation," argued that

> a nurse evaluates the patient, provides a description of the medical condition for the doctor, and then the doctor is left to make the decision as to what caused that condition, what the condition is and what treatment to provide. A nurse cannot stand in the shoes of a doctor in the course of her practice and diagnose and treat medical conditions without consulting a doctor. If she did that, she would lose her license. And so . . . a nurse should not be able to stand in the shoes of a doctor in . . . a CQE or frankly testify at trial that a particular condition was proximately caused by any breach in the standard of care because, again, that is going outside the scope of her practice.

Because "pressure wounds can develop because of all kinds of different issues, . . . a nurse consults a doctor to ultimately assess the issue and provide a treatment plan." Moreover, even if a "nurse could opine as to the issue of causation to support the survival claim, . . . there's no basis for a nurse to be qualified to opine on cause of death."

In response, counsel for Mrs. Robinson maintained that Canton Harbor was

16

asking [the court] to create a bright-line rule in decubitus ulcer cases that there's going to be a mandatory requirement of two certificates: One by a nurse who judges the standard of care as to whether it's been breached in long-term healthcare facilities such as the one in the settings we're in; and second, a physician's certificate of qualified expert which then discusses the issue of causation. That is simply not in the statute. That is simply not in the case law. . . .

We dealt with the issue and looked at it from different states, and under item 5 of our reply provided to the [c]ourt, at least six cases that have concluded the other way. Understanding that the nature of the claims deals with bedsores. And, particularly, one of the cases from Missouri states that nurses were qualified to give expert testimony regarding bedsores, their cause and treatment. One of the important function[s] of nurses is to prevent the formation of decubitus ulcers in bedridden patients.

Counsel emphasized that under "federal standards for nursing home care[,]" compliance is "squarely on the shoulders of like and similar healthcare providers -- not physicians" so that nurses working in "long-term care facilities addressing decubitus ulcers are intimately familiar with this area of . . . medicine, . . . and should be able to provide witness testimony." Notably, counsel announced that "we are not pursuing a claim that . . . the Defendant's negligence caused the death of the patient. We are abandoning that and limiting it to the cause [of] the decubitus ulcers, the treatment and care . . . to address that issue and the medical expenses associated with that."

The circuit court granted Canton Harbor's motion to dismiss, without leave to amend, explaining:

The issue involved in this matter is whether a registered nurse can serve as a qualified expert under Maryland Code Courts and Judicial Proceedings section 3-2A-04(b)(1)(1). The [c]ourt finds that the Plaintiff's designated expert Ms. Jones-Sing[h] is a healthcare provider as -- that's defined under Courts and Judicial Proceedings section 3-2A-01(f)(1). The [c]ourt further finds that she is qualified to attest to the standard of care and deviation there[from] for nurses.

17

However, when considering Maryland Code Health Occupations 14-101(o) and 8-101(o) as well as COMAR section 10.27.09.01.B(16), *the [c]ourt finds that a registered nurse cannot make a medical diagnosis, and therefore, cannot determine a medical condition nor the cause of a condition. Therefore, the [c]ourt concludes that a registered nurse cannot attest that there was a departure from the standard of care that's the proximate cause of the alleged injury as required by Courts and Judicial Proceedings section 3-2A-04(b)(1)(1).*

As such, the [c]ourt finds that the certificate of qualified expert is defective. And Courts and Judicial Proceedings section 3-2A-04(b)(1)(1) mandates dismissal. Furthermore, the [c]ourt finds that . . . there has been no showing of good cause for an extension of time. And, therefore, the [c]ourt will not grant such. So the [c]ourt is going to enter an order of dismissal of this matter for those reasons.

(Emphasis added).

## *Appeal*

Mrs. Robinson noted this timely appeal, raising three questions, which we have consolidated and rephrased: Did the circuit court err in granting Canton Harbor's motion to dismiss based on the court's interpretation of CJP § 3-2A-04's CQE requirement?

As we shall explain, we conclude that in a negligence case against a skilled nursing facility for decubitus ulcer injury, Maryland's CQE requirement under the HCMCA may be predicated on a proximate causation opinion by a registered nurse with sufficient education and experience in preventing and treating the ulcer injury alleged in the complaint. Here, the CQE and Jones-Singh's accompanying report and affidavit are sufficient to support her attestation that Canton Harbor breached nursing standards of care in a manner that proximately caused ulcer injuries to Mr. Robinson, as alleged in Count One of the complaint.

18

**STANDARDS GOVERNING REVIEW**

Maryland's Health Care Malpractice Claims Act establishes the statutory framework for negligence claims against health care providers. In pertinent part, CJP § 3-2A-04 provides:

(b) Unless the sole issue in the claim is lack of informed consent:

(1)(i)1. Except as provided in item (ii) of this paragraph, a claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant or plaintiff fails to file *a certificate of a qualified expert* with the Director *attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury*, within 90 days from the date of the complaint . . . .

(Emphasis added).

This Court recently reviewed the history and purpose of the CQE requirement. "The HCMCA and its amendments evolved in response to multiple reported crises in Maryland's marketplace for medical malpractice insurance." *Jordan v. Elyassi's Greenbelt Oral & Facial Surgery, P.C.*, 256 Md. App. 555, 570 (2022). "[I]n 1986, the General Assembly passed a significant amendment to the HCMCA, introducing CQE requirements[.]" *Id*. at 571 (citing *DeMuth v. Strong*, 205 Md. App. 521, 538-39 (2012)). This provision is "designed to serve a gatekeeping function," by "'eliminat[ing] excessive damages and reduc[ing] the frequency of claims'" in order to "'weed[] out non-meritorious claims and ultimately reduc[e] medical malpractice insurance expenditures.'" *Id*. (first two alterations in original) (quoting *DeMuth*, 205 Md. App. at 539).

Pertinent to this appeal, we summarized the standards governing dismissal of a negligence claim for failing to satisfy the CQE requirement:

19

The sufficiency of a CQE is a question of law, and the standard "is the same as determining whether a complaint is legally sufficient"—that is, after assuming the truth of all assertions in the CQE and taking all permissible inferences in favor of its validity, we ask whether the CQE meets the requirements set forth in the HCMCA. *See Carroll v. Konits*, 400 Md. 167, 179-80 & n.11 (2007). As with other questions of law, our review is *de novo*. In interpreting statutory language, we bear in mind that the "cardinal rule" of statutory construction is to ascertain and give effect to the General Assembly's intent. As such, we first assess whether the statutory language is clear and unambiguous. If it is, we will not add or delete words or force a particular interpretation; we will simply interpret the language as written and end our inquiry . . . .

If the statutory language is ambiguous, however, we engage in a broader inquiry by resolving the ambiguity "in light of the legislative intent, using all the resources and tools of statutory construction at our disposal." In that case, we may consider "not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives[,] and [the] purpose of the enactment[.]" And we may interpret the language with regard to various indicia of legislative intent, including "the structure of the statute, including its title; how the statute relates to other laws; the legislative history[;] . . . the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions."

*Id.* at 567-69 (last five alterations in original) (footnote omitted) (some citations omitted).

**DISCUSSION**

Mrs. Robinson renews her contention that for CQE purposes, a registered nurse can opine as to the proximate cause of a decubitus ulcer. In her view, the CQE filed in this action was properly predicated on the expertise of a registered nurse who had sufficient education and experience to attest that Canton Harbor breached nursing standards for preventing and treating decubitus ulcers in a manner that proximately caused the ulcer injuries alleged in Mrs. Robinson's complaint.

Canton Harbor again counters that a proximate cause opinion in a CQE is necessarily a "medical diagnosis" requiring a level of expertise that a registered nurse does

20

not have.  In support, Canton Harbor points to the relevant portion of the statutory definition of the "practice of registered nursing" as encompassing "nursing diagnosis[,]" which in turn is defined by regulation as "***a description of the actual or potential, overt or covert health problems which registered nurses are licensed to treat***."  COMAR 10.27.09.01(B)(16) (emphasis added).  Comparing this language to the definition of practicing medicine as engaging "in medical . . . [d]iagnosis[,]" HO § 14-101(o)(1), Canton Harbor contrasts the dictionary meaning of that term, as "the determination of medical conditions, as well as the cause or nature of said conditions."

Based on its narrow interpretation of "nursing diagnosis," Canton Harbor argues that Maryland's "legislature did not intend for nurses to attest in a CQE to proximate causation[,]" because that "would, in effect, require the nurse to opine on issues outside the scope of the practice of registered nursing" by "determin[ing] the cause of a medical condition – i.e., a medical diagnosis."  In Canton Harbor's view, "[t]hat is the quintessential scenario the Act was intended to prevent."  In turn, "[b]ecause a registered nurse cannot attest to proximate causation, [Mrs. Robinson's] CQE . . . fails to satisfy the requirements of CJP § 3-2A-04(b)(1)(i)" and dismissal is required.  CJP § 3-2A-04(b)(1)(i) ("[A] claim or action . . . shall be dismissed without prejudice" if the plaintiff fails to file a valid CQE.).  For that reason, Canton Harbor argues, the circuit court correctly dismissed the complaint.

As the parties acknowledge, nothing in the language of the HCMCA expressly precludes a registered nurse from being a qualified expert for purposes of the CQE requirement.  Indeed, the statute provides that a "health care provider" may serve as the expert in a CQE, CJP § 3-2A-02(c)(2)(ii), and a registered nurse falls within the statute's

21

definition of "health care provider." CJP § 3-2A-01(f). Canton Harbor concedes that Jones-Singh "may be a qualified expert who can attest in a certificate to departures of the standard of care for nurses," but contends that nurses may not opine as to *proximate causation.* As noted, this presents an issue of first impression in Maryland.[6]

We conclude that under Maryland's statutory and regulatory framework governing nursing services at a skilled nursing facility like Canton Harbor, a CQE may be predicated on the attestation of a registered nurse that breach of nursing standards for preventing and treating decubitus ulcers proximately caused the ulcer injury alleged in the negligence complaint. Federal statutes and regulations governing skilled nursing facilities like Canton Harbor require such facilities to "be licensed under applicable State and local law[,]" 42 U.S.C. § 1395i-3(d)(2)(a), and to "operate and provide services in compliance with all applicable Federal, State, and local laws and regulations . . . and with accepted professional standards and principles which apply to professionals providing services in such a facility." 42 U.S.C. § 1395i-3(d)(4)(A). "A skilled nursing facility must care for its residents in such

---

[6] Although no reported Maryland case has addressed whether a registered nurse may satisfy the proximate cause requirement for a CQE in a medical negligence case, our Supreme Court has rejected a related contention that a pharmacist is *per se* disqualified from giving an expert opinion in an informed consent case. In *Shannon v. Fusco*, 438 Md. 24 (2014), the family of a patient who died after taking a medication prescribed by his oncologist sued for lack of informed consent regarding the risks of taking the drug while undergoing radiation therapy. The Court "reject[ed] [the defendant physician's] argument that a pharmacist is *per se* unqualified to testify in an informed consent action when a physician has been sued." *Id*. at 55. Even though that pharmacist "had the requisite expertise to testify about the material risks of the administration of" that particular drug, the Court concluded that his proffered testimony did not in fact address the material risks at issue in that case. *Id*. at 56.

a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident[,]" 42 U.S.C. § 1395i-3(b)(1)(A), and provide "nursing services and specialized rehabilitative services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident[,]" 42 U.S.C. § 1395i-3(b)(4)(A)(i).

Under Md. Code (1982, 2023 Repl. Vol.), § 19-1401(e)(1) of the Health-General Article ("HG"), a "nursing home" is

> a facility that offers **nonacute inpatient care to patients** suffering from a disease, chronic illness, condition, disability of advanced age, or terminal disease **requiring maximal nursing care** without continuous hospital services **and who require** medical services and **nursing services rendered by or under the supervision of a licensed nurse** together with convalescent, restorative, or rehabilitative services.

(Emphasis added). Like nursing homes, registered nurses are subject to licensing and practice requirements established by statute and regulation. Under HO § 8-101(o), the General Assembly has defined the practice of registered nursing as follows:

> (o)(1) "Practice registered nursing" means **the performance of acts requiring substantial specialized knowledge, judgment, and skill** based on the biological, physiological, behavioral, or sociological sciences **as the basis for assessment, nursing diagnosis**, planning, implementation, and evaluation of the practice of nursing **in order to**:
>
> (i) Maintain health;
>
> (ii) **Prevent illness**; or
>
> (iii) **Care for or rehabilitate the ill, injured, or infirm**.
>
> (2) For these purposes, **"practice registered nursing" includes:**
>
> (i) Administration;
>
> (ii) Teaching;

23

(iii) Counseling;

(iv) *Supervision, delegation, and evaluation of nursing practice*;

(v) *Execution of therapeutic regimen, including the administration of medication and treatment*;

(vi) *Independent nursing functions and delegated medical functions*; and

(vii) Performance of additional acts authorized by the Board under § 8-205 of this title.

(Emphasis added).

Canton Harbor's argument that "nursing diagnosis" is merely a "description of . . . health problems" and therefore precludes nurses from opining on proximate causation in all cases ignores how nursing diagnosis fits within the regulations concerning standards of practice for registered nurses. COMAR 10.27.09.02 provides an overview of the functions of a registered nurse, which requires that registered nurses:

1) "collect client health data" "using appropriate assessment techniques[,]" COMAR 10.27.09.02A(1), (4);

2) "analyze the assessment data in determining nursing diagnoses[,]" COMAR 10.27.09.02B(1);

3) "identify expected outcomes" based on the diagnoses, COMAR 10.27.09.02C(1), (2)(a)(i);

4) "develop a plan of care that prescribes interventions to attain expected outcomes[,]" COMAR 10.27.09.02D(1);

5) "implement the interventions identified in the plan of care[,]" COMAR 10.27.09.02E(1);

6) "evaluate the client's progress toward attainment of outcomes[,]" COMAR 10.27.09.02F(1); and

7) "revise the nursing diagnosis, outcomes, and the plan of care" based on "effectiveness of interventions," COMAR 10.27.09.02F(2)(c), (e).

Performance of these functions, which focus on identifying and attaining expected *outcomes*, implicitly requires registered nurses, acting within the scope of their duties, to assess the probable *cause* of further injury if nursing intervention is unsuccessful.

As we read this statutory and regulatory framework, pressure ulcers are among the "health problems which registered nurses are licensed to treat[,]" COMAR 10.27.09.01(B)(16), so that preventing and caring for them fall within the scope of "nursing diagnosis" and "nursing services" that may properly be "rendered by or under the supervision of a licensed nurse." *See* HG § 19-1401(e)(1). Indeed, we find it significant that federal regulations expressly classify care of decubitus or pressure ulcers as "skilled nursing care." Among other nursing duties that require comparably specialized education, training, protocols, and physician supervision, federal public health regulations define "[s]ervices that qualify as skilled nursing services" to include ***"[t]reatment of extensive decubitus ulcers or other widespread skin disorder[.]"*** 42 C.F.R. § 409.33(b)(6) (emphasis added).[7] Consistent with federal regulations, a Maryland statute mandating

---

[7] Under 42 C.F.R. § 409.33(b), "skilled nursing services" also encompass the following:

(1) Intravenous or intramuscular injections and intravenous feeding[;]

(2) Enteral feeding that comprises at least 26 per cent of daily calorie requirements and provides at least 501 milliliters of fluid per day[;]

(3) Nasopharyngeal and tracheostomy aspiration;

25

quality assurance programs in nursing homes lists "prevention of decubitus ulcers" as "nursing care." HG § 19-1410(b)(5)(ii).

Maryland nursing home regulations similarly identify the scope of services that nurses may perform. COMAR 10.07.02.18, titled "Nursing Services," provides that a nursing home must employ sufficient staff to "[e]nsure that a resident . . . [r]eceives proper care to prevent pressure ulcers." COMAR 10.07.02.18C(3)(c). The same regulation also provides that a restorative nursing care program "shall include . . . [e]ncouraging and assisting residents to change positions at least every 2 hours to . . . prevent pressure ulcers." COMAR 10.07.02.18G(3). Notably, the "Physician Services" regulation in the same chapter makes no mention of pressure ulcers, COMAR 10.07.02.14, suggesting that prevention of pressure ulcers in nursing homes is primarily a nursing function not requiring the expertise of a physician.

---

(4) Insertion and sterile irrigation and replacement of suprapubic catheters;

(5) Application of dressings involving prescription medications and aseptic techniques;

. . .

(7) Heat treatments which have been specifically ordered by a physician as part of active treatment and which require observation by nurses to adequately evaluate the patient's progress;

(8) Initial phases of a regimen involving administration of medical gases; [and]

(9) Rehabilitation nursing procedures, including the related teaching and adaptive aspects of nursing, that are part of active treatment, e.g., the institution and supervision of bowel and bladder training programs.

26

We note that in 2010 the president of the American Nurses Association issued a statement clarifying that, despite "pressure ulcer" being a medical diagnosis,

> RNs would not be practicing outside their scope of practice if the nurse identifies the alteration in skin integrity as a pressure ulcer and stages it before the admitting provider. On the contrary, it is the expectation that the RN actually does that. Anything less does not fulfill our professional standard and commitment to the patient.

Rebecca M. Patton, *Is Diagnosis of Pressure Ulcers Within an RN's Scope of Practice?*, American Nurse (Jan. 11, 2010), https://www.myamericannurse.com/is-diagnosis-of-pressure-ulcers-within-an-rns-scope-of-practice/.

Because managing decubitus ulcers constitutes the type of core "skilled nursing services" that may be within the expertise of a registered nurse, we agree with Mrs. Robinson that in a medical negligence case, a registered nurse may be qualified to attest that breach of applicable standards of nursing care for preventing and treating decubitus ulcers proximately caused the plaintiff's ulcer injury. Nothing in our decision contravenes the established principle that expert witnesses must be "qualified . . . by knowledge, skill, experience, training, or education" to "assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Md. Rule 5-702.

The scope of our holding is narrow. We hold only that in negligence cases alleging breach of nursing standards for preventing and treating decubitus ulcers, a registered nurse is not disqualified *per se* to attest that failure to adhere to such standards proximately caused the plaintiff's ulcer injury. In these limited circumstances, we do not share Canton Harbor's concerns about registered nurses overstepping their expertise in managing pressure ulcers by predicating their proximate cause opinions on impermissible medical

27

diagnoses. If and when that happens in a particular case, the same remedy at issue here—dismissal—will be available to court and counsel.

Nor does our construction of the CQE requirement otherwise undermine its purpose to screen out meritless claims. *See DeMuth*, 205 Md. App. at 539. To the contrary, that has already happened in this case. As we detailed, this CQE was predicated on Jones-Singh's attestation that breaches in the standards of nursing care for preventing and treating ulcers proximately caused Mr. Robinson's ulcer injuries while at Canton Harbor. Because the CQE lacks any opinion that Mr. Robinson's death was proximately caused by Canton Harbor's breaches in the standards of nursing care, however, there is no proximate causation attestation to support Mrs. Robinson's wrongful death claim.[8] In apparent recognition of that insufficiency, plaintiffs' counsel stated at the motion hearing that Mrs. Robinson was no longer pursuing a wrongful death claim, but instead limited her damages claim to the ulcer injuries Mr. Robinson allegedly suffered while he was at Canton Harbor.[9]

---

[8] "Maryland's wrongful death statute allows the maintenance of an action 'against a person whose wrongful act causes the death of another.'" *Spangler*, 449 Md. at 47-48 (quoting CJP § 3-902(a)). "The primary beneficiaries of a wrongful death action are the spouse, parent, and child of the decedent." *Id*. at 48 (citing CJP § 3-904(a)(1)). "Where the decedent is a spouse, . . . the wrongful death statute provides damages for 'pecuniary losses,' if any, in addition to damages for 'mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable[.]'" *Id*. (quoting CJP § 3-904(c)-(d)).

[9] In light of Mrs. Robinson's concession that the CQE would be insufficient to attest to the proximate cause of Mr. Robinson's death, we surmise that Mrs. Robinson likewise abandons the Estate's claim for funeral expenses.

28

For these reasons, the circuit court erred in construing Maryland's statutory scheme governing health care malpractice claims to disqualify a registered nurse in all cases from attesting to proximate causation in a decubitus ulcer case. Because preventing and treating decubitus ulcers are within the recognized scope of skilled nursing services, a CQE may be predicated on attestations by a registered nurse with sufficient education and experience that breach of nursing standards proximately caused such ulcer injury.[10]

_____

[10] The parties rely extensively on out-of-state caselaw to support their respective positions. Our review of the relevant caselaw reveals that most of the cases are distinguishable from the present case. Nevertheless, it appears the weight of authority supports our conclusion that qualified nurses may give expert testimony regarding the treatment and cause of decubitus ulcers. *See, e.g.*, *Gaines v. Comanche Cnty. Med. Hosp.*, 143 P.3d 203, 206 n.10 (Okla. 2006) (collecting extrajurisdictional cases holding that "nurses may offer expert testimony concerning the development or prevention of decubitus ulcers"); *Mellies v. Nat'l Heritage, Inc.*, 636 P.2d 215, 224 (Kan. Ct. App. 1981) (ruling that "if a proper foundation is laid as to the nurse's experience with decubitus ulcers, she or he can qualify as an expert as to causation"); *Parris v. Uni Med, Inc.*, 861 S.W.2d 694, 699 (Mo. Ct. App. 1993) (holding no abuse of discretion in allowing nurses to give expert testimony regarding cause and treatment of bedsores because they "had extensive experience" given that "[o]ne of the important functions of nurses is to prevent the formation of decubitus ulcers in bed-ridden patients"); *Freed v. Geisinger Med. Ctr.*, 971 A.2d 1202, 1212 (Pa. 2009) (overruling *Flanagan v. Labe*, 690 A.2d 183 (Pa. 1997), "to the extent it prohibits an otherwise competent and properly qualified nurse from giving expert opinion testimony regarding medical causation" in case alleging negligence in preventing and caring for pressure wounds), *aff'd on reargument*, 5 A.3d 212 (2010); *cf. Rasor v. Nw. Hosp., LLC*, 419 P.3d 956, 963 (Ariz. Ct. App. 2018) (noting that under Arizona law, a registered nurse may establish a "'nursing diagnosis,' which includes determining the 'etiology' or cause of a disorder" (citations omitted)). We recognize that there is contrary authority. *Vaughn v. Miss. Baptist Med. Ctr.*, 20 So. 3d 645, 652 (Miss. 2009) ("We now explicitly hold that nurses cannot testify as to medical causation."); *Esquivel v. El Paso Healthcare Sys., Ltd.*, 225 S.W.3d 83, 90-91 (Tex. App. 2005) (holding that nurse could not express opinion as to "causal link" related to alleged decubitus ulcer injuries); *Kent v. Pioneer Valley Hosp.*, 930 P.2d 904, 907 (Utah Ct. App. 1997) (holding that nurse was not qualified "to opine as to nerve damage caused by an allegedly improper injection"). In our view, the relevant caselaw generally reflects what the medical and

Finally, we examine the CQE from Jones-Singh, and her incorporated report and affidavit. "The sufficiency of a CQE is a question of law, and the standard 'is the same as determining whether a complaint is legally sufficient[.]'" *Jordan*, 256 Md. App. at 567 (quoting *Carroll*, 400 Md. at 180 n.11). Thus, we assume the truth of all well-pleaded allegations in the CQE, "taking all permissible inferences in favor of its validity[.]" *Id.* We conclude the CQE is *prima facie* sufficient to support both Jones-Singh's breach and proximate cause attestations.

We first note that Jones-Singh did not diagnose Mr. Robinson's decubitus ulcers. Instead, his medical records establish that a registered nurse performed nursing assessments upon admission on August 16, 2018, and again on August 20, 2018, documenting the appearance and progression of multiple pressure ulcers and other compromised skin conditions. Consistent with treating decubitus ulcer care as a core nursing function, the record cited in Jones-Singh's report (and incorporated into her CQE) reflects that identifying, documenting, preventing, and treating decubitus ulcers were responsibilities undertaken by Canton Harbor's registered nurses.

Jones-Singh reviewed Mr. Robinson's care in light of her education and experience in managing skilled nursing services for long term care patients. As Mrs. Robinson points out, Jones-Singh's report and affidavit reflect her peer-to-peer review, *i.e.*, examination by a registered nurse with education and experience in treating incontinent and immobile

---

nursing communities already know—that nurses routinely engage in the prevention and treatment of decubitus ulcers.

30

patients at a skilled nursing facility providing long term care, based on records relating to the care rendered to that patient.

In her CQE and affidavit, Jones-Singh identified herself as a registered nurse with more than 16 years of clinical and management experience that includes staffing and managing a skilled nursing facility providing long term care to patients requiring assistance with mobility and continence care. Reflecting her training and experience, she demonstrated her familiarity with the specific federal nursing standards of care cited in her Report regarding skilled nursing services to prevent and treat decubitus ulcers. After accepting those medical diagnoses and nursing records, Jones-Singh observed that Canton Harbor's nurses were responsible for conducting and supervising skin checks, repositioning, and other preventive and therapeutic ulcer-care protocols throughout Mr. Robinson's five months at Canton Harbor. Given the significant risk of Mr. Robinson developing pressure ulcers while at Canton Harbor, his documented medical and nursing care history, and Jones-Singh's stated expertise in skilled nursing standards for the prevention and care of decubitus ulcers, Mrs. Robinson presented a sufficient factual basis to establish that Jones-Singh was qualified to attest to a reasonable degree of nursing certainty that Canton Harbor breached standards of nursing care in a manner that proximately caused Mr. Robinson's pressure ulcer injury.

## CONCLUSION

We hold that in a negligence action filed under Maryland's HCMCA against a skilled nursing facility alleging pressure ulcer injury, a CQE may be predicated on attestations by a registered nurse that a skilled nursing facility's breach of applicable

31

nursing standards proximately caused a patient's ulcer injury.  *See* CJP § 3-2A-04(b)(1).

Because Mrs. Robinson's CQE was based on sufficient attestations by Jones-Singh, the

circuit court erred in dismissing this complaint.  Accordingly, we vacate the judgment and

remand for further proceedings.[11]

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  COSTS TO BE PAID BY APPELLEE.**

---

[11] Because we hold that Mrs. Robinson's CQE was sufficient, we need not address her argument that the circuit court erred by denying her an extension of time to file a corrected CQE.